579 So.2d 1167 (1991)
Alice PRUDHOMME, Plaintiff-Appellant,
v.
DeSOTO PROFESSIONAL HOME HEALTH SERVICES and Commercial Union Insurance Company, Defendants-Appellees.
No. 22331-CA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1991.
*1168 Brittain, Williams, McGlathery, Passman & Sylvester by J. Morgan Passman, Natchitoches, for plaintiff-appellant.
Lunn, Irion, Johnson, Salley & Carlisle by Julia A. Mann, Shreveport, for defendants-appellees.
Before LINDSAY, BROWN and STEWART, JJ.
BROWN, Judge.
On July 9, 1987 plaintiff, Alice Prudhomme, sued for worker's compensation benefits. She claimed to have been disabled due to a work-related injury that occurred on March 6, 1985. Plaintiff was paid worker's compensation benefits until May 13, 1986 when they were terminated by defendants after receiving medical opinions that plaintiff could return to work. Plaintiff named as defendants her employer, DeSoto Professional Home Health Services, (Health Services) and its insurer, *1169 Commercial Union Insurance Company. After a lengthy trial on the merits, the court found that plaintiff's claims for disability benefits had prescribed but those for supplemental earnings benefits (SEB) had not. However, the court denied supplemental earnings benefits finding that plaintiff failed to prove a causal connection between the accident and her disability. Plaintiff then appealed the rejection of her claim for supplemental earnings benefits. The issue presented is factual and finding no manifest error, we affirm.

FACTUAL CONTEXT
Plaintiff was 51 years old on the date of the accident and had been employed as a Licensed Practical Nurse since 1970. Prior to the accident in this case, plaintiff injured her back in 1974 while lifting a patient and eventually had surgery for a bulging disc. Plaintiff received worker's compensation benefits and returned to work approximately six months thereafter. In 1982 plaintiff had a minor automobile accident. Following the accident plaintiff experienced such back pain that she was unable to work for approximately one year.
Plaintiff was first hired in April 1981 by defendant, Health Services, but was voluntarily terminated in August 1982 after indicating she was unable to work. She was subsequently hospitalized and was found to have degenerative changes of the entire lumbar spine. Between 1979 and 1984, she was hospitalized on approximately five different occasions and was seen by numerous physicians regarding her back complaints. Plaintiff was rehired in July 1983 and returned to work on a part-time basis for approximately one month before returning to full-time status.
Plaintiff's job duties as a home health nurse included taking patients' vital signs, teaching the family how to care for the patient, caring for the patient's wound or bed sores, changing catheters if necessary and administering insulin for diabetic patients. Driving was required in order to visit the patients' homes, many of whom lived in rural isolated areas throughout Sabine and DeSoto parishes. She was required to carry nursing supplies, such as catheters, weighing approximately seven pounds. Plaintiff was rated by her employer as an above average nurse in the performance of her duties.
On March 6, 1985, plaintiff was at a patient's home and completed taking vital signs with a thermometer, blood pressure cuff and stethoscope. Although plaintiff gave several inconsistent versions, it appears that she then turned away from the patient and felt a burning pain in her back and right hip. Plaintiff completed her rounds, seeing three more patients. She returned home and called a neighbor to help get her into bed due to back pain. At trial, plaintiff complained of disabling chronic low back pain occurring since the date of the accident.
Following the 1985 accident, plaintiff was seen by a multitude of physicians for evaluation and treatment. She was examined immediately following the accident by Dr. Leigh Dillard, a general practitioner, who had treated her since 1978. Plaintiff was complaining of back and leg pain mainly on the right side. Due to plaintiff's previous history, Dillard felt hospital admission was indicated. Tests revealed the suggestion of a bulging disc at the L5-S1 interspace. Dillard continued to treat plaintiff based on her subjective complaints of pain and believed she would eventually get better. Plaintiff indicated on January 6, 1986 that she had injured her back with the minor trauma of reaching up to get some canned goods off the shelf. However, the examination showed no significant change. Dr. Dillard did not feel that plaintiff had sustained a new injury but rather only an exacerbation of her continued symptoms. By February 13, 1986, Dr. Dillard had become frustrated with plaintiff's progress and did not feel that there was any surgical solution. Dr. Dillard felt plaintiff had degenerative arthritis and disc disease with chronic sciatica. Dr. Dillard admitted plaintiff's stress seemed to play a large part in her physical condition as during a crisis plaintiff would come in with severe back pains. Dr. Dillard had previously treated plaintiff for back pain following *1170 the 1982 car accident and at that time felt she had a chronic low back syndrome which made her unable to work. Dr. Dillard felt that any exacerbation that plaintiff may have experienced due to the work-related injury had been resolved and he could not relate any of plaintiff's present complaints to her alleged work injury.
Dr. Jack Grindle, a general surgeon and family practitioner, had also treated plaintiff for a number of years. Dr. Grindle stated plaintiff had worked for approximately 12 years without any pain and was unaware of any back problems plaintiff may have had between 1974 and 1985. Dr. Grindle did not know why plaintiff had had continuing pain since March 1985 as normally the pain should have only existed for a short period of time. Dr. Grindle noted that other factors could have exacerbated plaintiff's condition after that time. Based on plaintiff's history and onset of chronic pain immediately after March 1985, Dr. Grindle believed that the incident had contributed to or aggravated plaintiff's condition as she became more symptomatic after that date.
Dr. William Bundrick, an orthopedic surgeon, examined plaintiff on February 17, 1986 at the request of the defendants. The neurological exam was normal and Bundrick found no evidence of any recent nerve root irritation. X-rays revealed narrowing of the L5-S1 disc space and some minimal changes at the L3/4 disc space. Dr. Bundrick's impression was that plaintiff had a chronic lumbosacral myoligamentous strain with no evidence of nerve root irritation. Dr. Bundrick recommended that plaintiff continue conservative treatment and did not see the need for surgical intervention. Bundrick felt that plaintiff could return to work as of March 1986 with a limitation of moderate to heavy lifting of 35 to 50 pounds. Given her history, Dr. Bundrick could not tell whether plaintiff's chronic back strain was due to degenerative disc disease or to her alleged injury. Dr. Bundrick stated it would be very difficult to determine the actual site of plaintiff's pain and when it originated.
Plaintiff was examined by Dr. Richard Gray, a neurosurgeon, on April 17, 1986 upon a referral by Dr. Grindle. Plaintiff complained of back and left leg pain and related her history of having a discectomy in 1974, being pain free for 12 to 13 years and reinjury in 1985. Plaintiff did not reveal any problems with her lower back during that interim. Dr. Gray felt plaintiff's examination was near normal and she could probably be successfully treated with conservative measures. Dr. Gray believed that most of her problems were the result of a lumbar sprain or strain and surgery was not indicated. The examination did not reveal an indication that plaintiff had a ruptured disc and Dr. Gray believed that plaintiff could go back to some type of work limiting her lifting to 10 pounds with minimal bending. Dr. Gray released plaintiff to return to work and stated she appeared to be in good health. Dr. Gray performed a myelogram and the comparison of that myelogram with one taken several years earlier showed no changes. The myelogram was normal other than for some post-surgical changes at the lower lumbar segment. There was no evidence of any type of disc bulge or impingement of nerve roots. Dr. Gray stated that plaintiff's initial accident was not the type of injury one would suspect would cause a ruptured disc and with plaintiff's history, he assumed plaintiff's "injury" was probably an exacerbation of her original problem of degenerative changes that occurred in 1974. Plaintiff's description of her onset of pain would be more a manifestation of her preexisting problem rather than a separate injury.
Plaintiff was then seen by Dr. Albert Dean, another orthopedic. Plaintiff related a history of back problems with pain and previous surgery in 1974. Plaintiff stated that she had done well following the surgery until the March 1985 accident. Plaintiff's x-rays and myelogram were unremarkable. Plaintiff had some narrowing of the L5-S1 disc indicating degenerative changes but Dr. Dean did not find any disabling condition or evidence of disc herniation or rupture. Plaintiff's myelogram showed a slight change at the L5-S1 disc *1171 space slightly to the left and a slight posterior bulge at the L4-L5 space. There was also scarring at the L5-S1 disc level. After completing his testing, Dr. Dean was convinced there were no objective symptoms or signs of injury. In August 1986, Dr. Dean was of the opinion that plaintiff could return to work but would not be able to perform any hard labor or heavy lifting. Dr. Dean did not believe plaintiff's twisting injury in March 1985 would have been a permanent aggravation of her condition. A patient with degenerative disc disease could have that condition aggravated with a simple move such as twisting and reaggravated with other different activities. With numerous such episodes over the course of several years, there would be no way with any degree of medical certainty to ascertain one incident was the cause of pain. Dr. Dean was not able to state which incident was the initial or contributing cause. Based upon plaintiff's history, Dr. Dean stated it was highly unlikely that plaintiff had gone through a two year period of time without pain in her back.
Plaintiff was also examined by Dr. Phillip Osborne at the Willis-Knighton Center for Occupational Medicine. Dr. Osborne performed extensive tests as well as reviewing previous medical records. Dr. Osborne assigned plaintiff a 7% impairment. A psychological profile revealed plaintiff had a dependent personality which was not related to trauma but was something plaintiff had lived with all of her life. Plaintiff had a higher complaint level than 90% of normal females and was somewhat a childish, self-centered and pessimistic person who tended to develop vague hypochondriacal complaints or to magnify actual physical symptoms to control or manipulate others. This type of patient usually saw a number of doctors and was typically a "doctor shopper". Dr. Osborne stated he was familiar with the job requirements of a home health nurse and plaintiff was able to do 99% of the job. Plaintiff could lift 13 pounds on a fairly repetitive basis and if her weight lifting was under this amount, she could perform the job duties. Dr. Osborne stated that plaintiff had reached maximum medical benefits and would not respond to treatment. Dr. Osborne testified that the twisting in March 1985 with onset of pain was a very minor episode and possibly a manifestation of the problems plaintiff had been having for a number of years.
Plaintiff testified that her pain was getting worse all the time and although she would love to return to work, she felt she could not perform the proper functions of a nurse. Plaintiff admitted that she had back pain in the two years that she worked with Health Services prior to the accident and knew that she could not do any heavy lifting but was able to fully perform all of her job duties.
Plaintiff had maintained a 20-30 foot flower garden since 1987 and had performed some nursing duties in her apartment complex for elderly residents. She sold hot tamales in order to make extra money and also had a chicken house from which she sold eggs. Prior to the accident, plaintiff was the manager of an apartment complex and continued management duties following the accident. Plaintiff testified that she drove but not frequently as the pain made her miserable. Plaintiff contended that she was healthy until she had this accident with the exception of the 1982 car accident. Plaintiff admitted that the pain she had in her legs and lower back in 1982 was essentially the same problem she had prior to her surgery in 1974 and that the pain in March 1985 was basically the same as that experienced in 1982.
The testimony of other witnesses established that plaintiff had driven residents of her complex to doctor visits and other appointments. Plaintiff was observed driving frequently with no problem getting in and out of her pickup truck as well as walking normally and hanging clothes without difficulty on a clothesline. The neighbors testified that plaintiff worked in her flower bed, weeding and planting bulbs, as well as her chicken house and had not complained recently of back pain. The neighbors classified plaintiff as a "worker".
After reviewing the testimony and the evidence, the trial court noted that plaintiff had sustained more than one injury to her *1172 back and had been consistently diagnosed as suffering from degenerative disc disease with chronic low back problems. While noting the voluminous and conflicting medical testimony, the trial court found it was undisputed that plaintiff had significant back problems prior to the date of the alleged accident. Taking the medical evidence as a whole, the court found that plaintiff's back problems existed well before March 1985 and were not strictly related to work. Further, there was a good chance that plaintiff reinjured her back or exacerbated the condition after 1985. While the court stated it believed that plaintiff did have a legitimate disability and was in pain, it could not find that her problems were directly related to the March 1985 accident. The court also stated that it had serious doubts that the incident described by plaintiff could be defined as an accident under the worker's compensation statute. Finding that plaintiff did not prove by a preponderance of the evidence that her injury was work-related, the court rejected plaintiff's demands.

DISCUSSION
Under LSA-R.S. 23:1209 plaintiff's action for disability benefits had prescribed but not her action for supplemental earnings benefits. However, to be entitled to SEB plaintiff must prove a work-related injury and resulting disability.
The trial court has the responsibility of determining whether a work-related injury occurred and if the claimant is disabled. The finding of disability within the framework of the worker's compensation law is a legal, rather than a purely medical, determination. It is the function of the trial court to assess the weight to be accorded the medical and lay testimony in making its determination on the question of disability. It is well-settled that the trial court's factual findings are entitled to great weight. Reasonable evaluations of credibility and reasonable inferences of fact will not be disturbed on appeal even though the appellate court may feel that its own evaluations and inferences are as reasonable. Owens v. Georgia Pacific Corporation, 535 So.2d 990 (La.App. 2d Cir.1988); Jackson v. Georgia Casualty and Surety Company, 513 So.2d 530 (La.App. 2d Cir.1987), writ denied, 515 So.2d 448 (La.1987); Degruy v. Pala, Inc., 525 So.2d 1124 (La.App. 1st Cir.1988), writ denied, 530 So.2d 568 (La. 1988), and Cormier v. Save-Time, Inc., 497 So.2d 404 (La.App. 3d Cir.1986).
The claimant in a worker's compensation proceeding has the burden of establishing disability and its causal relation with an employment accident by a preponderance of the evidence. In order for the claimant to recover benefits, it must be determined that the employment somehow caused or contributed to the disability but it is not necessary that the exact cause of the disability be found. The claimant's disability is presumed to have resulted from an accident if before the accident the claimant was in good health but commencing with the accident the symptoms of the disabling condition appeared and thereafter continuously manifested themselves. For this presumption there must be sufficient medical evidence to show a reasonable possibility of a causal connection between the accident and activation of the disabling condition or that the nature of the accident, when combined with the other facts of the case, raises a natural inference through human experience of such a causal connection. An abnormally susceptible worker is entitled to no less protection than a healthy worker and it is immaterial that the diseased or weakened condition eventually might have produced the disability outside employment. Thus, a preexisting disease or infirmity does not disqualify a claim if the work-related injury aggravated, accelerated or combined with the disease or infirmity to produce a disability for which compensation is claimed. The presumption of causation is not irrebuttable, rather when established, the effect is to shift the burden of proof to the defendant. For the defendant then to prevail, he must produce evidence and persuade the trier of fact that it is more probable than not that the work-related injury did not accelerate, aggravate, or combine with the preexisting disease or infirmity to produce the employee's disability. Walton v. Normandy Village *1173 Homes Association, Inc., 475 So.2d 320 (La.1985); Patterson v. GNB Battery, Inc., 569 So.2d 640 (La.App. 2d Cir.1990); Dunn v. Allen Pulpwood, 565 So.2d 516 (La.App. 2d Cir.1990); Loyd v. IMC Fertilizer, Inc., 557 So.2d 1078 (La.App. 2d Cir.1990), writ denied, 561 So.2d 102 (La.1990), and Toth v. Ensco Environmental Services, 546 So.2d 188 (La.App. 1st Cir.1989), reversed on other grounds, 551 So.2d 623 (La.1989), writ denied 551 So.2d 632 (La.1989).
In order to be entitled to these SEB, an injured employee must be unable to earn 90% or more of the wages he received at the time of injury. LSA-R.S. 23:1221(3). The applicable burden of proof is by a preponderance of the evidence. The injured employee thus bears the burden of proving by a preponderance of the evidence that the injury resulted in his inability to earn that amount. The employer may preclude these benefits by establishing that the employee is physically able to perform work that was either offered or tendered by the employer or any other employer or proven available to the employee in the employee's or employer's community or reasonable geographic region. An employee able to earn but not earning 90% or more of his former wages is not entitled to SEB. Daigle v. Sherwin-Williams Company, 545 So.2d 1005 (La.1989); Duncan v. State, DOTD, 556 So.2d 881 (La.App. 2d Cir.1990), and Myers v. Stone Container, Inc., 556 So.2d 202 (La.App. 2d Cir.1990), writ denied, 560 So.2d 30 (La.1990).
As noted earlier, a plaintiff in a worker's compensation case must establish that an employment accident occurred which caused injury, that plaintiff is disabled and that such disability is causally related to the injury. Assuming that the twisting episode was an "accident", the trial court found that plaintiff's back problems were of longstanding and concluded that plaintiff did not prove by a preponderance of the evidence that her injury was work-related. After reviewing the record, we agree.
While plaintiff argues that she had established the presumption of a causal relationship between her alleged disabling symptoms and the work-related accident, we find, as did the trial court, that the presumption of causation is not applicable. The presumption requires that before the accident, the employee had not manifested disabling symptoms but that commencing with the accident these disabling symptoms appeared. Further there must be either medical or circumstantial evidence indicating a reasonable possibility of a causal connection.
The evidence in the instant case clearly established that plaintiff had suffered severely disabling back problems as early as 1974 when she was injured lifting a patient and off from work for six months. Further, a minor automobile accident in 1982 caused plaintiff to suffer such severe symptoms that she was unable to work for one year. During the period of 1979 through 1984, plaintiff consulted with numerous doctors for treatment of her back condition and was hospitalized on at least five separate occasions. Plaintiff admitted that she still had problems with her back between 1982 and 1985. Plaintiff's condition before the alleged work-related accident was diagnosed as degenerative disc disease and plaintiff had a weakened back due to her surgery in 1974.
Following the accident in March 1985, plaintiff once again sought the opinion and treatment by numerous physicians of various specialties. These doctors agreed plaintiff was suffering from degenerative disc disease but without objective signs of injury, were unable to conclusively state with any degree of medical certainty that the alleged twisting incident was the cause of plaintiff's pain and disabling symptoms. The medical testimony indicated that a patient with plaintiff's past problematic history combined with ongoing degenerative disc disease could have that condition aggravated by such simple moves as sneezing or bending.
Plaintiff gave inconsistent versions as to how her accident occurred and further did not tell several of the physicians her history of back problems following the initial 1974 surgery. Following the 1985 incident, extensive testing by different specialists *1174 showed no change in plaintiff's condition from tests performed in 1982. The medical consensus was that the twisting injury may have briefly aggravated plaintiff's underlying degenerative disc disease but this was a minor trauma which should not have been permanently disabling. The doctors could not explain why plaintiff had continued to experience disabling pain since the date of the alleged injury. One of plaintiff's primary treating physicians, Dr. Dillard, felt that any kind of exacerbation that plaintiff may have experienced due to the work-related injury had been resolved.
Following physical examinations and testing, plaintiff had been released to return to work by several of her treating physicians. After reviewing the job requirements, the doctors felt that plaintiff could perform her duties as a home health care nurse with the limitation of not performing heavy lifting. The job was flexible in that plaintiff would not be required to sit or stand for an extended period of time which would fit within the limitations imposed by her condition. The doctors agreed that inactivity would be detrimental to plaintiff's condition and that some type of work would be beneficial. For these reasons, we concur with the conclusion of the trial court that plaintiff failed to meet her burden of proof as to causation.
Additionally, based upon our review of the record, it does not appear that plaintiff proved that she was disabled as the result of any work-related injury. As noted above, despite numerous physical examinations and rigorous testing, no objective signs of injury were found and plaintiff's condition remained unchanged from her condition in 1982. Furthermore, plaintiff was able to work as the manager of an apartment complex and on occasion cleaned apartments and maintained the grounds by picking up litter. Plaintiff further maintained a large flower garden which required her to plant bulbs and weed. Plaintiff performed light nursing duties for the elderly residents of her apartment complex and drove frequently with ease taking these residents to appointments. Plaintiff was known by neighbors as a "worker" who observed no indication of any disabling condition. The evidence was clear that plaintiff could return to the light duties of a home health care nurse and there were many other nursing jobs available to her even with her physical limitations. Considering all of this evidence, we do not believe that the plaintiff proved the existence of a work-related disability.
As we have concluded that plaintiff did not sustain a work-related disability, plaintiff's other claims are without merit and need not be considered.

DECREE
For these reasons, the judgment of the trial court in favor of defendants is AFFIRMED at plaintiff's costs.